## In re BREUER.

No. 1296.

District Court, D. North Dakota, N. E. D.

Nov. 30, 1943.

Edgar P. Mattson, of New Rockford, N. D., and O. O. Myhre, of Minneapolis, Minn., for petitioner.

William Lemke, of Washington, D. C., for the bankrupt.

John F. Lord, of St. Paul, Minn., amicus curiae in connection with the rental question.

NORDBYE, District Judge (acting under assignment to the District of North Dakota).

A rather complete recital of the facts will be helpful. On October 4, 1940, the bankrupt filed his petition under Section 75 of the Bankruptcy Act, 11 U.S.C.A. § 203. He failed to reach an agreement with his creditors under Subsections a to r, and on November 16, 1940, he amended his petition under Subsection s and was duly adjudicated a bankrupt on that date. In accordance with the provisions of the Act, the first appraisal was filed with the Conciliation Commissioner on November 26, 1940, and the 320 acres of land and buildings thereon were appraised at $1,600. This is described as the Southwest quarter (SW¼) of Section Twenty-one (21), and the East half of Northwest quarter (E½ of NW¼) and the East half of Southwest quarter (E½ of SW¼) of Section Twenty-eight (28), Township One Hundred Fifty-four (154) North, Range Seventy-one (71) West, Benson County, North Dakota. Another tract on which the Farmers and Mechanics Savings Bank of Minneapolis had a loan was likewise appraised at $1,600. A three-year stay was duly entered, and rentals were fixed and paid for the year 1941. On or about March 1, 1942, the bankrupt filed his petition for redemption and deposited with the

984

Commissioner the appraised value of $3,-200 for the purposes of redeeming the two tracts of land. On May 29, 1942, the Commissioner ordered a hearing on the petition filed by the bankrupt. On June 18, 1942, the Prudential Insurance Company filed its return and answer to the petition objecting to the redemption at the appraised value and requested that the real property of the bankrupt be reappraised at its true, full and fair value, and that the creditor have such other relief as might be mete and just in the premises. On the same date, there was filed a so-called request for reappraisal in which this secured creditor requested that the Court cause a reappraisal of the debtor's property, or in its discretion set a date for hearing, and after such hearing fix the value of the property in accordance with the evidence submitted. The Farmers and Mechanics Savings Bank filed its objections to the petition for redemption on the 19th day of June, 1942, and requested that the Conciliation Commissioner order a reappraisal of the premises in which it was interested and "to set a date for hearing upon such objections and exceptions as may be made at which time testimony and evidence may be received determining the value of said real estate."

· Thereafter, the Conciliation Commissioner appointed new appraisers and on July 21, 1942, their appraisal was filed with the Commissioner. The tract of land on which the Prudential had its mortgage lien was appraised at $1,920, an increase of $320 over the 1940 appraisal. The other tract, in which the Farmers and Mechanics Bank was interested as a mortgage creditor, was appraised at $1,600, the same figure as the original appraisal. Objections were filed by the secured creditors to the reappraisal, and thereafter the Commissioner fixed a date for hearing to be held upon the petition for redemption by the bankrupt. Apparently some delay occurred and the hearing was not scheduled before the Conciliation Commissioner until November 4, 1942, at which time the parties appeared and evidence was taken by the Commissioner as to the market value of the land in question.

On March 5, 1943, the Commissioner made extended findings of fact and conclusions of law, and in all things approved the reappraisal of the real property in question made under date of July 21, 1942. In this order, he required the bankrupt to deposit with him the further sum of $320 on or before the first day of May, 1943, said sum being the difference between the first appraisal and the second appraisal. The Farmers and Mechanics Bank accepted the amount of the reappraisal and is no longer concerned with the questions which have arisen. The Prudential Company, however, has filed its petition for review and urges that the valuation of $1,-920 fixed as to the 320 acre tract on which it has its mortgage is grossly inadequate and seeks to have the order of the Commissioner set aside for various alleged errors which took place at the hearing before the Commissioner, and requests that additional evidence be taken by the Court or that the matter be remanded to the Conciliation Commissioner with appropriate instructions.

 The petition to review the order of the Conciliation Commissioner of March 5, 1943, approving the reappraisal, will first be considered. At the outset, it should be noted that the bankrupt has entered a special appearance objecting to the Court's considering the creditor's petition for review. Briefly stated, the bankrupt contends that the creditor cannot have both a reappraisal and a hearing before the Commissioner, and having requested of the Conciliation Commissioner that he order a reappraisal, or in his discretion hold a hearing and take testimony, and the Commissioner having ordered a reappraisal, such reappraisal "became a final judgment." Apparently it is the bankrupt's position that, as to the "final judgment," there is no right of review. It may be noted that the Conciliation Commissioner did not approve the reappraisal until he filed his order on March 5, 1943. However, the bankrupt urges that the Conciliation Commissioner exceeded his authority when he ordered a hearing on November 4, 1942, and therefore takes the position that this Court has no jurisdiction to consider a review of a proceeding which is not countenanced or sanctioned by the Act in question. But in suggesting that there is no review of a reappraisal, the bankrupt would invoke a construction of the Act which might result in a manifest injustice, not only to the rights of the creditors, but as to the bankrupt as well. It is hardly conceivable that the bankrupt would urge this position if perchance he had requested a reappraisal and the valuation was excessively high. In any event,

it would seem that the plain intendment of the Act is to obtain a judicial approval of the fair value of the property so that the bankrupt may redeem at such value. Certainly, at some stage of the proceeding there must be such judicial approval. In absence of a request for a reappraisal, it may be obtained either by the Conciliation Commissioner's approving the original appraisal, or if a reappraisal is requested, it may be obtained by the approval of such reappraisal by the Commissioner. But it necessarily follows that, if the Commissioner determines that he should hear testimony before he approves a reappraisal, he has such inherent authority. It cannot be successfully urged that, if the reappraisal is too high or too low, the debtor on the one hand, or the creditor on the other, has no recourse in having the matter brought before the Court for its judicial review and determination of the question of fair value. Here, the creditor timely objected to a redemption at the reappraisal value. The Commissioner, before he would pass upon the soundness of the reappraisal and the petition to redeem at the original appraised value, determined to take evidence and make his own findings. This he was unquestionably authorized to do.

Assume, for instance, in the instant situation, that the Conciliation Commissioner simply approved the reappraisal without taking any evidence. Under the Act as interpreted by the Supreme Court, the bankrupt or the creditor could petition for a review under Order 47 of the General Orders in Bankruptcy, 11 U.S.C. A. following section 53. Carter v. Kubler, 64 S.Ct. 1, decided November 8, 1943. Upon such petition, the District Court, in the exercise of sound discretion, could send the entire matter back to the Conciliation Commissioner to take evidence and report to it, or the Court could hold a hearing and upon the evidence submitted, make its own findings as to the fair value. The hypothetical situation suggested merely illustrates the mechanics which may be employed or followed in obtaining a determination of fair value, and the proceeding adopted by the Commissioner herein is entirely consistent with the plain intendment and purposes of the Act. As stated in Re Wright, 7 Cir., 126 F.2d 92, 94: " * * * The court, in the interest of justice, can, and should, make a reappraisement, if the facts warrant it. No express statutory authorization for a reappraisement would be necessary. It is inherent in equity principles. Moreover, we think the statute authorizes reappraisals." And at page 95 of 126 F.2d: "A fair construction of the statute would seem to permit of a change in appraisal, if the facts warrant or require it. And this is so regardless of who is helped or hurt by the reappraisement."

See, also, In re Whitwer, D.C., 44 F. Supp. 466.

The special appearance of the bankrupt, therefore, will be, and is, overruled.

Whether the Court should approve the findings of the Commissioner as to the value of the real estate in question presents a perplexing problem. The entire proceedings have been unduly protracted, and I am hesitant to increase the delay which has already occurred. However, the Court in sitting as a court of review in a proceeding of this kind cannot become a mere rubber stamp and approve the results in a proceeding which appear to him to be manifestly erroneous. It may be urged that the errors committed by the Commissioner in his rejection of competent evidence may not be so glaring that a reappraisal or rehearing is mandatory. Moreover, I cannot say that there is not substantial evidence which, if believed, would sustain his findings of value. But I am firmly convinced that substantial error has been committed and that the Commissioner has given but little, if any, weight or consideration to any of the testimony except such as was introduced by the bankrupt. The "general community harmony and co-operation" referred to in Dunsdon v. Federal Land Bank of St. Paul, 8 Cir., 137 F.2d 84, 86, is clearly evident in this transcript. In his schedules filed in 1940, the bankrupt places a value on this half section of $1,920, and none of the witnesses produced by the bankrupt deviated from that approximate value, at least no one gave an estimate of any higher figure. Even the Commissioner was always alert to champion the bankrupt's cause when opportunity afforded. For instance, when the question of the amount of insurance carried by the bankrupt on the farm buildings was suggested as being of some probative value or help in determining the reasonable redemption price which should be approved, the following colloquy took place:

"Q. Now, you carry insurance on these buildings, Mr. Breuer? A. Yes, sir.

"Q. Do you know how much? A. I don't know exactly how much insurance.

"Q. Have you any idea? A. Well, not exactly; I have it in the Benson County Mutual but I haven't that policy with me.

"Q. Would you say you carry about Three Thousand Dollars worth of insurance on the house? A. Not that much; they discourage you from taking too much insurance,—I would say about Three Thousand Dollars for the whole outfit.

"Q. You say that you have your insurance in the Farmers Mutual Lightning and Fire Insurance Company of Benson County? A. Yes, sir.

"Q. I show you a document marked 'Exhibit 2', and ask you to state whether you have seen that document before? A. I suppose I have to get my glasses. Yes, that is it.

"Q. That is your application for fire insurance? A. Yes, sir.

"Conciliation Commissioner: What time was that made? A. It was made a year ago last fall sometime.

"Conciliation Commissioner: Didn't I request you to get insurance on the buildings when you were in Court before? A. I don't just remember; I kind of forget those things.

"Q. Is that your signature on this? A. Yes, sir.

"Q. For insurance purposes, Mr. Breuer, you think the value of the buildings would be about the same as the value you made in that application for fire insurance?

"Mr. Lemke: Just a minute; I object to that as being incompetent and irrelevant and not tending to prove the present value of the real estate here in question but rather a replacement in case of loss which is not the rule of ascertaining the value of real estate but rather what would it sell for if he were ready and willing to sell to a willing buyer.

"Conciliation Commissioner: I think you are right, Mr. Lemke, but I am going to ask a few questions. It has been the rule in most of these cases to try to keep up the insurance on the buildings to protect the bankrupt and the secured creditors and that was one reason why I asked Mr. Breuer and informed him that he had to take care of that insurance. Didn't I tell you that, Mr. Breuer? A. Yes, sir.

"Conciliation Commissioner: And you just went in and had a renewal of the other insurance? A. Yes, Mr. Dickinson was sick and he couldn't take care of it.

"Conciliation Commissioner: I am going to sustain the objection.

"Mr. Mattson: I am excepting to the ruling of the court.

"Conciliation Commissioner: I was the one who instructed Mr. Breuer that he must get insurance and to renew his other old policies."

And upon objection being made to the application for insurance, the Conciliation Commissioner sustained the objection, contending that it had no relation to the question of establishing the present value of the property.

Whether the insurance was ordered by the Commissioner or the bankrupt, the fact remains that $3,000 insurance was placed on the buildings located on the farm on which the Prudential has its mortgage. Certainly, the Commissioner must have approved the amount of the insurance as reasonable. In determining the reasonable market value of this property, the Commissioner apparently refused to give any consideration to the fact that both he and the bankrupt felt that $3,000 insurance was reasonable under all the circumstances. When it is realized that this farm consists of 320 acres of land and that the farm buildings alone have an insurable value of $3,000, it would seem that it should have some consideration when one seriously asserts that $1,920 is a reasonable redemption value. Moreover, the Commissioner refused to give any consideration to the original loan application which was made in the year 1931. At that time, the bankrupt over his signature swore that the buildings were reasonably worth the sum of $12,000 and the land $11,200, or a total of $23,200. Concededly, land values have been depressed since 1931. The present value on real estate and buildings may be far removed from the bankrupt's sworn statement in 1931, but to suggest that it is not admissible for any purpose whatsoever seems unreasonable. The Court can take judicial notice of the fact that, while farm values have been greatly depressed since 1931, there has been a marked enhancement of value during the past few years, and North Dakota

has had during the years 1942 and 1943 the best crop that that State has been favored with for several years. Then, again, the Commissioner refused to give any consideration to the assessed value of the property in question. Granted that the assessed valuation of real estate may not be of controlling importance, at least it is entitled to some weight and consideration. It appears that for 1942 the assessed valuation of the Southwest quarter of Section 21, Township 154 North, Range 71 West, was $2,558, exclusive of the value of the buildings, and the East half of the West half, Section 28, same township and range, has an assessed valuation of $1,666 for that year, making a total assessed valuation of $4,224. However, when this testimony was offered in evidence, it was objected to by Mr. Lemke.

"Mr. Lemke: I object to this testimony because the assessed valuations do not prove the present value or tend to prove it.

"Conciliation Commissioner: You are right; I know that isn't the value because I know what they set their values at around here and Nineteen Dollars for pasture and some Twenty-seven when you couldn't get Five or Six or Seven Dollars. I sustain the objection."

■ The ruling of the Commissioner indicates a conclusion not based on evidence, but from personal knowledge or personal investigation, which was condemned in Carter v. Kubler, supra. Certainly, the Commissioner had no right as a judicial officer to refuse to consider the assessed valuation of this real estate to aid him in arriving at a true and correct value of this property for the reasons assigned in the statement above quoted. There was no evidence in the record which substantiated his view that property assessed at $19 or $27 an acre would only bring a fraction of that sum on the market. In addition, a reading of the record indicates that the Commissioner entertained the view that sales in the neighborhood which were not made for cash would be ignored. In expressing this view, he erred. As stated by Judge Sanborn in Kauk v. Anderson, 8 Cir., 137 F.2d 331, 334: "In the instant case, the Commissioner did not competently try the issue of value. He did not receive or consider evidence offered by the appellee of recent sales of farms similar to the farm in suit. The Commissioner re-

garded such evidence as inadmissible because it related to sales which were not made for cash. The fact that the sales were not for cash could be considered in determining the probative value of the evidence, but not as affecting its admissibility. The general rule is that all considerations that might reasonably be given substantial weight by an owner willing to sell and a purchaser desiring to buy in arriving at the value of land in fair negotiations, should be taken into account in determining its worth." (Citing cases)

The evidence is quite convincing that this farm is unusually well equipped with buildings. The barn was partly destroyed by wind two years ago, but the bankrupt admitted that the barn was repaired with the insurance money that he obtained to the extent of $1,500. Again, it may be observed that the appraised valuation which the Commissioner approved is only $420 more than the repairs that were made to the barn two years ago. The evidence indicates that, of the 320 acres, some 280 are under cultivation. The land is at least good, average farming land. The bankrupt has resided there for over 40 years. The house is a large, commodious dwelling, well constructed, which cost the bankrupt some $10,000 to build twenty to twenty-five years ago. The barn is a large structure, 40 by 100. There is a shop 20 by 40; a granary 40 by 16; and "an old shack of a home that the hired men sleep and board in." There is a good well on the farm and a wind mill. The farm is well located as to roads, towns and schools. There is over a mile and a half of good, or at least fair, fencing on the half section. The witnesses produced by the mortgagee qualified themselves as competent to express an opinion as to land values in the neighborhood of the Breuer land. One witness testified that a fair valuation of the land is $15 an acre. He made a separate and additional valuation of the buildings at $5,000. Another witness testified as to sales in the neighborhood of property less attractive than the Breuer land at $10 to $12 an acre. The local banker testified that the Breuer land was reasonably worth $15 an acre. It may be that these opinions reflected values which are too high, and certainly the Commissioner was not obliged to follow the views expressed by the witnesses produced by the mortgagee. On the other hand, I entertain a very firm belief that,

988

on the evidence submitted and offered, the reasonable market value of this land will be found at some figure between the estimates of value given by the witnesses for the bankrupt and those given by the witnesses for the mortgagee.

If I were to approve the Commissioner's findings as to value, I could not escape the conviction that I would be stultifying myself in so doing and become a party to a result which impresses me as manifestly unjust. Our Circuit Court of Appeals has said in the Dunsdon case, page 86 of 137 F.2d: " * * * What we have said should therefore not be taken to imply that a district judge is utterly helpless in any case to deal with a specific situation, simply because the record submitted to him on review meets the mechanical tests and standards which we have detailed. Under the Bankruptcy Act, we think that a district judge must be regarded as occupying inherently a more fundamental status and relationship in the administration of bankruptcy affairs than those of an ordinary appellate tribunal. * * * As we have indicated in the Carmody case, 131 F.2d at page 323, situations may exist where, in the interest of justice, he may soundly exercise a discretion to receive or require additional evidence in connection with a review of a conciliation commissioner's order, and determine from the entire record thus before him whether a correct result has been reached."

While one deprecates the delay that has taken place in determining the amount that the bankrupt should pay by way of redemption, an ·obvious injustice should not be condoned for that reason alone. Although it is recognized that the farmer seeking relief under the Frazier-Lemke Act should not be subjected to lengthy and expensive proceedings in court because the very benefits and purposes of the Act may thus be defeated, on the other hand, if the bankrupt assumes to deliberately scale down the value of his farm to a ridiculous amount, it may be fair to observe in passing that he should expect that there will be petitions for review and the delays incident thereto. In any event, the Court is clear that he cannot escape the responsibility which rests upon him to bring about a result which squares with his sense of justice and fair dealing. In view of the foregoing, the findings and conclusions and order of the Conciliation Commissioner,

therefore, must be, and are, vacated and set aside.

The question then arises as to the proceedings which should be adopted and followed in granting a rehearing on the question of the reasonable market value of the bankrupt's farm. The Court might take additional evidence, which procedure is apparently approved in the Dunsdon case. However, in view of the fact that I am acting by assignment, arrangements to that end are connected with some practical difficulties. The entire matter might be referred to the present Commissioner with instructions and no doubt he would endeavor to dispose of the questions with fairness to both sides. However, after due consideration, I have concluded that the most satisfactory method is to refer the matter to a referee wholly unconnected with any of the prior proceedings. He can arrange to conduct his hearing at a place convenient to the bankrupt and his witnesses as well as to the petitioning creditor. The order to be submitted may provide that the referee appointed shall, at the request of either party, receive and consider any evidence offered and received at the hearing held before the Conciliation Commissioner on November 4, 1942, with the same force and effect as a deposition taken in this proceeding. Either party may offer additional evidence touching upon the reasonable market value of the 320 acres in question. The referee will make his findings and conclusions and report to me. An order appointing such referee will be made.

The remaining question concerns the rentals for 1942. The bankrupt contends that he is not obligated to pay rent for that year because he paid into court the sum of $1,600, which was the original appraised value of the property, and upon making this payment he formally petitioned to redeem the property. He therefore contends that he is not obligated to pay any rentals after the payment and tender of this money as the redemption price. A brief consideration of the facts, however, will indicate the error and unsoundness of the bankrupt's position. It was in May, 1942, when he made the deposit. At that time, the only appraisal was the original appraisal made by the three appraisers. It is admitted that no petition to review or appeal was taken from that appraisal. Notwithstanding, it must be conceded that, under the Act,

when the bankrupt seeks to redeem, the secured creditor is permitted to ask for a reappraisal. When the reappraisal was made, the valuation was increased from $1,600 to $1,920. Moreover, it was not until March 5, 1943, that the reappraisal received the Commissioner's approval. Under no possible theory, therefore, could the bankrupt be sustained in his contention that he is not required to pay rent for the year 1942. At no time during that year did he ever make or tender a deposit in the sum of $1,920, which was the valuation arrived at by the reappraisal in July, 1942, and approved by the Commissioner in March, 1943. He was not bound by the first appraisal; neither was the secured creditor. In re Wright, supra.

When a farmer becomes a bankrupt under Section 75, sub. s, he is required to turn his property over to the court for administration. If he does not redeem within the time specified, the property will be sold, either at public auction upon the request of the secured creditor or creditors, or a trustee will be appointed and the property sold or otherwise disposed of as provided by the Act. Pending the right of redemption within the three-year period, the bankrupt is permitted to retain possession of his land upon certain conditions, but the land, however, is in the "custody and under the supervision and control of the court." The bankrupt is required to pay reasonable rental for that part of the property of which he retains possession. True, the Act is somewhat indefinite as to the length of time that the rental must be paid, but it necessarily follows that during the period the property is in the custody of the court, he is obligated to pay a reasonable rental. The property does not leave such custody and control until a valid turn-over order is made by the court wherein the property is vested in the bankrupt, free and clear of all encumbrances. Clearly, such turn-over order can not be made until the court has determined the fair market value. It is not necessary to determine in this proceeding the obligation to pay rental after the payment into court of a sum which is subsequently and finally approved by the Court as the fair market value.

The bankrupt fails to consider that his property is in the custody and under the control of the Court and that his position is similar to that of a receiver or trustee. The record indicates that there was no assurance that the bankrupt would even redeem at the reappraised value until some time in March, 1943. If his position is to be sustained, he could retain possession of the property during 1942, fail to pay the taxes for that year, and when he sought to redeem at the figure approved by the Commissioner, contend that he was entitled to obtain his property free from liens and insist that the taxes for 1942 be deducted from the $1,920, which is the reappraised value. The Act never intended any such absurd result. That these views are in harmony with those entertained by the Supreme Court in Wright v. Vinton Branch, 300 U.S. 440, at page 466, 57 S. Ct. 556, at page 564, 81 L.Ed. 736, 112 A.L.R. 1455, seems clear from the statement of Judge Brandeis wherein he commented upon the reasons for, and the nature and character of, the position of the bankrupt farmer: " * * * The mortgagor is familiar with the property, and presumably vitally interested in preserving ownership thereof and ready to exert himself to the uttermost to that end. It is not unreasonable to assume that, under these circumstances, the interests of all concerned will be better served by leaving him in possession than by installing a disinterested receiver or trustee. For the mortgagor holds possession charged with obligations imposed for the benefit of the mortgagee as fully as if the property were in the possession of a receiver or trustee, and there is probably a saving of expense." And in commenting upon the rental payments to be made by the mortgagor under the Act, the court stated (300 U.S. at page 468, 57 S.Ct. at page 565, 81 L.Ed. 736, 112 A.L.R. 1455): " * * * These payments prescribed by the Act are in accordance with the common practice in foreclosure proceedings where the property is in the hands of receivers."

It follows, therefore, that the bankrupt is required to forthwith account for and pay to the Conciliation Commissioner the 1942 rentals. It is so ordered.